DOWD, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | CASE NO. 4:03 CR 159 |
| Plaintiff(s), | ) | |
| | ) | |
| v. | ) | MEMORANDUM OPINION |
| | ) | |
| Michael E. Jackson, | ) | |
| | ) | |
| Defendant(s). | ) | |
| | ) | |

### **I. Introduction** [1]

The defendant entered a plea of guilty to a single count of possession of a firearm as a convicted felon. On December 16, 2003, pre-*Booker*, the Court sentenced the defendant to a term of probation with home detention for a period of six months, including work release privileges. The government appealed the Court's downward departure. In its published decision, the Sixth Circuit described the merits of the downward departure, which was used by this Court as the basis for the home detention sentence, as "problematic," which suggests to this Court that the *Jackson* court was of the view that the departure in a pre-*Booker* setting could not withstand appellate scrutiny. However, rather than reverse and order the Court to sentence within the mandatory guideline range that existed at the time of the initial sentence, the Sixth

---

[1] The Court was recently introduced to the concept of a "must" panel at the Sixth Circuit, which involved this Court's participation as an assigned judge sitting with the Sixth Circuit. In summary, this Court wrote an unpublished decision in a case involving four criminal defendants and then, when the fifth defendant's appeal was subsequently filed, this Court participated in the resolution of that defendant's appeal. This case appears to satisfy the requirements for a "must" panel; therefore, the Court assumes the initial panel will be assigned the appeal which will likely follow.

(4:03 CR 159)

Circuit remanded for re-sentencing in light of the *Booker* teachings, which now call for an advisory guideline calculation,[2] and then a consideration of the sentencing factors under 18 U.S.C. § 3353(a).

In preparation for the new sentencing hearing, the Court requested counsel to brief the issue of whether the Court should request and consider a report from the Probation Department as to the defendant's conduct while serving the term of probation previously ordered.

The government filed a memorandum arguing as follows:

> Should this Court agree that the remand here in issue constitutes a general, rather than a limited remand, the Court would appear to have the authority to "require and consider" an updated presentence report in resentencing the defendant.  Using information in an updated report to justify a departure from the applicable guideline range on grounds other than those previously set forth by the Court, and upheld as "a permissible ground" by the Court of Appeals, however, would appear proscribed by § 3742(g), assuming the continuing viability of that provision after the *Booker* decision.  *See United States v. Williams*, [411 F.3d 675, 677-78 (6th Cir. 2005)] ("Although *Booker* excised 18 U.S.C. § 3742(e) in its remedy opinion, it left 18 U.S.C. § 3742(f) and (g) intact.")  A departure based on the defendant's post-sentencing rehabilitative efforts, if any, would also appear contrary to U.S.S.G. § 5K2.19, which specifically states that such efforst, "even if exceptional," are "not an appropriate basis for a downward departure when resentencing the defendant."  U.S.S.G. § 5K2.19

(Doc. No. 50 at 3-4).

---

[2]Although the Guidelines calculation following *Booker* is advisory, in a recent published decision, the Sixth Circuit joined other circuits in "crediting sentences properly calculated under the Guidelines with a rebuttable presumption of reasonableness[,]" concluding that such a presumption "comports with the Supreme Court's remedial decision in *Booker*." *United States v. Williams*, No. 05-5416, 2006 WL 224067, at *1 (Jan. 31, 2006).

The Court now expressly finds with respect to defendant Jackson that the presumption that the Guidelines sentence calculation is reasonable has been rebutted, as explained in this opinion.

(4:03 CR 159)

In the Court's view, consideration of the defendant's post-sentence conduct is at best a gray area.  However, in view of the uncertainty of the law in this post-*Booker* setting, and because 18 U.S.C. § 3553(a)(1) directs the Court to consider "the nature and circumstances of the offense and the *history and characteristics of the defendant*" (emphasis added), the Court decided to order an update from the Probation Department as to the defendant's conduct and situation since the now-failed sentencing of December 16, 2003.[3]

## II.  Calculation of the Advisory Sentencing Guideline Determination as it Pertains to the Defendant

The advisory guideline range has, before the issue of a departure, a Total Offense Level of 17 and a Criminal History of II, which calls for a sentencing range of 27 to 33 months.  Since the *Jackson* panel expressed skepticism as to whether this Court's initial departure would pass appellate review and rejected this Court's decision, in reliance on *United States v. One Star*, 9 F.3d 60 (8th Cir. 1993), not to parse the basis for the total departure, the Court will now devote its discussion exclusively to a Section 3553 analyis to support its variance to the sentence previously announced.

The Court is of the view that this discussion and analysis serves to rebut the presumption that the advisory Guidelines calculation is reasonable.  *See United States v. Williams*, No. 05-5416, 2006 WL 224067, at *1 (Jan. 31, 2006).

---

[3]The conclusion of the updated presentence report recently filed is summarized on page 7, *supra*.

3

(4:03 CR 159)

### III. The Court's Consideration of the Section 3553(a) Factors

**A.     The nature and circumstances of the offense and the history and characteristics of the defendant**

The presentence report identifies the Offense Conduct based on information obtained from the United States Attorney's Office and the Youngstown Ohio Police Department. It states:

> 8.     On January 30, 2003, at approximately 8:30 p.m., patrol officers of the Youngstown Police Department observed a blue Cadillac Sedan DeVille travelling eastbound on Rigby at a high rate of speed. The officers pulled their cruiser behind the Cadillac and observed the driver pull into a lot at 1405 Rigby without using a turn signal. Having observed one or more traffic infractions, the officers activated their overhead lights and initiated a "traffic stop" of the vehicle.
>
> 9.     The driver, defendant Michael E. Jackson, immediately exited his car, explaining to the officers that he had been driving fast in order to check on a business alarm that had apparently sounded in the area. Shortly after the stop, one of the officers looked into the Cadillac, peering through the windshield, and observed the butt of a handgun protruding from under the driver's seat. The officer instructed his partner to handcuff the defendant, and then proceeded to recover from the Cadillac a Hi-Point 9 mm pistol, with eight rounds of live ammunition. The defendant was arrested for carrying a concealed weapon and was subsequently issued a traffic citation for failure to signal.

As an explanation for his conduct, the defendant provided the Probation Department with the following written statement as set forth in paragraphs 13-15 of the presentence report:

> 13.     "*I, Michael E. Jackson, am writing this letter explaining why I was carrying a hand gun. It was not to hurt anybody or to commit a crime it was just for protection. I live with my grandmother who raised me. She is 90 years old and I love her and do not want anything to happen to her. We live in a bad neighborhood where gun shots are heard just about every day and night. I work in a*

4

(4:03 CR 159)

> *bad neighborhood painting cars since I have been laid off for 2 years. I have been shot at and robbed before.*

14. *"I was a deputy years ago working in the Mahoning County Jail and many times I have been threaten by inmates going to prison and saying that one day they are going to get me. I still communicate with friends of mine that are still correctional officers and they stop by often to see how I am doing. Thugs in the neighborhood think that I am a snitch because of the visits.*

15. *"All I ever wanted to do is make a honest living and be a good role model and provide for my children. I am trying to show them that there is a better way to survive instead of selling drugs. I made some mistakes in the past going through my divorce which I regret right now to this day because I ended up being a felon. I acted out letting my feelings control me. I have learned a lesson from my past but it haunts me today being a felon I learn to trust in God today to help me control anger and hurting feelings. I am sorry for carrying that gun. I never knew it would cost me my freedom. Things were just starting to get better in my life and being a felon, my job has called me back to work at a starting rate of $13.00 an hour with full benefits, many felons do not get a chance like that. Once again I am really sorry."* (italics in original).

The defendant is an African-American, born in 1964; he will be 42 on his next birthday. His parents died while he was a teenager. He suffered a difficult childhood and was taken from his parents at the age of 12, after he and his siblings were left alone in a house that caught fire. He was then adopted by his paternal grandmother, Cora Jackson. His 1985 marriage ended in 1997, and produced three children for whom he pays child support in the sum of $400 a month.[4]

---

[4] See Appendix I which includes a letter from Tina Jackson-Grissett, the former wife of the defendant and the mother of his three children. It is important to note that in the second paragraph of the Jackson-Grissett letter dated February, 2006, reference is made to "our four children". At the sentencing hearing conducted on February 22, 2006, the defendant's counsel explained that the fourth child was not the defendant's child but that the defendant had been involved in the life of that child. The second page of Appendix I supports the proposition that the defendant is providing health beneftits for the three children. The third page of Appendix I
(continued...)

5

(4:03 CR 159)

The defendant, as of the preparation of the presentence report in November of 2003, continued to live with his grandmother, Cora Jackson, who was at that time 90 years of age.

The defendant has always been engaged in employment since his 1982 graduation from East High School in Youngstown, Ohio. He worked as an insulation technician for Youngstown Area Community Action Council. He worked in that capacity from 1983 to 1994. He then received worker's compensation for two years due to a carpal tunnel injury. In 1995, the defendant received an Ohio Peace Officers Certification from the MTC Police Academy in Niles, Ohio. Such a certification is a condition precedent in Ohio to becoming employed as a police officer or a deputy sheriff.[5] In 1996, the defendant was employed as a deputy sheriff of Mahoning County; however, his employment was terminated in 1997 after his conviction for an assault following an altercation with an inmate in the Mahoning County Jail.[6]

---

[4](...continued)
supports the proposition that an on-going garnishment on the defendant's wages constitutes the child support payment for the defendant's three children.

[5]I trust a reviewing court will accept my background for this statement, based on my 14 years as a county prosecuting attorney, first as an assistant and then as the duly elected Prosecuting Attorney, and my additional over five years as a appellate judge in Ohio.

[6]This Court has been involved on two occasions with litigation challenging the conditions at the Mahoning County Jail. The first case, *Cummings v. Nemeth*, No. 4:92cv1838 filed in 1992, led to the Court's management of the case until a new "state of the art" Mahoning County Jail was constructed and opened in 1996. The consent decree in this first case was terminated by order dated November 30, 2001.

Notwithstanding the use of the new Mahoning County Jail, a second class action was filed. *See Roberts v. County of Mahoning*, No. 4:03cv2329. The case was randomly assigned to this branch of the Court. The Court published a 44-page opinion on March 10, 2005, finding that conditions at the jail violated the constitutional rights of the inmates. No remedial judgment entry has yet been filed. A special master has been appointed and the Court continues to work with a dysfunctional justice system in Mahoning County. It is difficult to summarize in a
(continued...)

(4:03 CR 159)

After the loss of his employment with the Mahoning County Sheriff's Office, the defendant was unemployed until he began work as a laborer for Geneva Steel in Youngstown. He worked there from 1998 to 2001, when he was laid off. At that point, the defendant became the owner/operator of Mike's Autobody in Youngstown. In 2003, the defendant was called back to work at Geneva Steel. The updated report of the Probation Department filed on January 26, 2006 reports that the defendant remains employed full time with Geneva Steel.

The updated report from the probation department also states that Mr. Jackson continues to reside with his grandmother at in Youngstown, Ohio. The report further states:

> Mr. Jackson has completed 25 months of supervision and has been compliant with all aspects of such since it commenced. Given the offender's prior criminal history, it appears that he made positive changes and is sincere in his commitment to remain law-abiding. He has incurred no new law violations and has always reported to the Probation Office as directed. <u>Mr. Jackson has also submitted Monthly Supervision Reports and financial documents accordingly. To date, all urine specimens have tested negative for illicit substances. In light of the aforementioned, Mr. Jackson could be considered a model offender</u>. No court action is being requested at this time. The officer will continue to monitor this case with appropriate reports to follow. (emphasis added)

**B.     The need for the sentence imposed**

    **1.     To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense**

---

[6](...continued)
footnote the situation in Mahoning County as to its justice system, other than to say the County is gripped with an enormous crime rate and insufficient public funding to manage the system. To the extent the relevance of this footnote is questioned, it is for the limited purpose of the observation that Mahoning County and, in particular, the City of Youngstown is a dangerous place, particularly for persons of an African-American background.

(4:03 CR 159)

The City of Youngstown is a dangerous place. It is important to prevent convicted felons from possessing firearms. The possession of a firearm by a convicted felon is a serious offense. This is true even when, as in this case, the defendant's concern for his own safety based on past experiences, led him to carry a firearm when responding to a burglar alarm at his own business.[7] It seems obvious that the Congress, in forbidding the possession of firearms that traveled in interstate commerce by previously convicted felons, reasoned that a felon was more likely to engage in additional crimes, and in violent action, if equipped with a firearm. It is imperative that felons, whatever the circumstances, understand that their status as a convicted felon disqualifies them from ever again possessing firearms, no matter what the basis for the possession might be determined to be. Thus the fact that the possessed firearm was not used to commit another crime is not an excuse to negate criminal responsibility.[8] It is important that the government prosecute such cases as this to promote respect for the law..

---

[7] See Appendix II consisting of two pages which reflect the fact that the defendant's garage came under gunfire on August 9, 2002, prior to the defendant's subsequent arrest for the instant offense. The defendant's arrest on January 20, 2003, when he was in possession of the firearm took place at the same garage, in the nighttime, and when the defendant was responding to a burglar alarm.

[8] During the first sentencing hearing conducted in 2003 in the month of December, the Court raised the issue as to where the defendant obtained the firearm. After hearing the defendant's claim that he obtained the weapon after he had been robbed, the Court inquired as to whom the defendant had obtained the firearm and he responded that it was from his "ex brother-in-law". The intial sentencing hearing took place on Wednesday, December 10, 2003. The Court continued the sentencing hearing in order to develop whether the defendant's contention that he had obtained the firearm after he had been robbed was truthful. The continued sentencing hearing then began anew on December 16, 2003, and the Court determined that as a consequence of the continued hearing that the defendant had been truthful in his declaration that he obtained the weapon from his ex brother-in-law. See Appendix III for a partial transcript of the testimony as well as the report of the Federal Defender's investigator dated December 11, 2003.

(4:03 CR 159)

The final issue under the "Need for the Sentence Imposed" is the requirement that the sentence provide "just punishment for the offense." The government contends that the Court should impose a sentence within the advisory guideline range and without regard to the circumstances of the discovery and seizure of the firearm. *Booker* teaches that the Court should consider, in addition to the advisory guideline calculation, the Section 3553 sentencing factors including the "Need for the Sentence Imposed." In the Court's view, consideration of the need for the sentence imposed should take into consideration more than the government's stated position that the surrounding facts involved in the possession are not relevant, nor should the Court engage in a consideration of the nature of the defendant. To the contrary, the requirement that the Court consider the history and characteristics of the defendant negates, in the Court's view, the government's position that the advisory guideline sentence should be imposed in order to satisfy "just punishment for the offense." Such a requirement, in the Court's view, directs the Court to consider the setting for the offense. In this case, the defendant was responding to a burglar alarm at his place of business, in darkness, where his safety might reasonably be considered to be at risk.

In the Court's view, and it so finds, a sentence to a period of three years probation with the requirement that the defendant spend 6 months in home detention with work release privileges satisfies the need for the sentence and constitutes just punishment for the defendant's violation of the statute that requires criminal sanctions. The sentence is reasonable and, at the same time, considers the calculation of the advisory sentencing guidelines.

(4:03 CR 159)

### 2. To afford adequate deterrence to criminal conduct

Under the precise circumtances of this case, the Court finds that the sentence requiring six months home detention with work release privileges affords adequate deterrence to criminal conduct, an in particular, by this defendant.

### 3. To protect the public from further crimes of the defendant

The defendant is now 42. He remains employed. His conduct while serving 25 months of probation as reported by his probation officer strongly suggests that the defendant is not a typical recidivist and the Court finds that it is not necessary to send the defendant to prison for a term of imprisonment for at least 27 months, as the government contends, in order to protect the public from further crimes of the defendant. The Court finds that a sentence of probation for three years with home detention for six months with work privileges was and is a sufficient sentence to protect the public from further crimes of the defendant.

### 4. To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner

The defendant has maintained employment for much of his life since graduation from high school. He has maintained his employment with Geneva Steel while serving his term of probation. The defendant represents a mature responsible adult despite the hardships endured during his childhood. He remains committed to the care of his grandmother who is apparently at this time 92 years of age. In the Court's view, and it so finds, the defendant is not in need of

(4:03 CR 159)

educational or vocational training, medical care of other correctional treatment. The Court also finds that the government's sentencing memorandum filed on September 29, 2005 does not suggest to the contrary.

### IV. Conclusion

The Court has attempted, with this opinion, to comply with the remand in this case. Had the Court's first sentencing decision been made in a post-*Booker* setting, rather than a pre-*Booker* setting, the Court would not have struggled with the issue of departures. Hence, the Court has ignored the issue of departure which it addressed in its initial sentencing. However, having made that statement, the Court, after considering the advisory sentencing guideline calculation and the sentencing factors of 18 U.S.C. § 3553(a), declares that a sentence of three years probation with six months home detention with work release privileges is, in this Court's view, a reasonable sentence in a post-*Booker* setting. Consequently, the Court's amended sentencing entry will repeat the original sentence, but with the declaration that the six-month period of home detention has been served and the special assessment of $100.00 has been paid. The three-year period of probation shall continue until served in its entirety.

IT IS SO ORDERED.

| | |
|---|---|
| February 23, 2006 | *s/ David D. Dowd, Jr.* |
| Date | David D. Dowd, Jr. |
| | U.S. District Judge |